**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HEATHER S., | : | CIVIL ACTION |
| **Plaintiff,** | : | |
| | : | |
| vs. | : | NO.    25-cv-2386 |
| | : | |
| FRANK BISIGNANO, | : | |
| Commissioner of Social Security, | : | |
| **Defendant.** | : | |

**<u>MEMORANDUM OPINION</u>**

LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE                              **April 10, 2026**

Heather S. (Plaintiff) filed this action seeking review of the Commissioner of Social

Security Administration's decision, pursuant to 42 U.S.C. § 405(g), denying her claim for

Disabled Widow's Benefits (DWB) under Title II of the Social Security Act, 42 U.S.C. § 402(e).

This matter is before me for disposition upon consent of the parties.  For the reasons set forth

below, Plaintiff's request for review is **DENIED**.

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for DWB on July 24, 2019, alleging disability

since September 13, 1997, due to a traumatic brain injury (TBI) with resulting migraines and

visual impairment, a movement disorder, arthritis, and glaucoma.  (R. 83-86).  Plaintiff's

applications were denied at the initial level and upon reconsideration, and she requested a

hearing from an Administrative Law Judge (ALJ), which occurred on May 5, 2021.  (R. 13-18,

41-82).  Plaintiff, represented by an attorney, appeared and testified at the hearing, as did an

impartial vocational expert (VE).  (R. 41-82).  On June 21, 2021, the ALJ issued a decision

unfavorable to Plaintiff.  (R. 21-40).  Plaintiff requested review of the ALJ's decision, and the Appeals Council denied her request on December 17, 2021.  (R. 13-18).

Plaintiff filed a complaint in this Court seeking review of the Commissioner's decision on April 27, 2022.  (R. 1421-27).  On October 18, 2022, the Court remanded the matter based on the Commissioner's uncontested motion.  (R. 1422).  The Appeals Council subsequently remanded the matter to the ALJ on December 12, 2022.  (R. 1414-20).  A second administrative hearing was held before an ALJ on December 20, 2023.  (R. 1363-1409).  Plaintiff, represented by an attorney, appeared and testified at the hearing, as did a VE.  (*Id.*).  On April 18, 2024, the ALJ issued another decision unfavorable to Plaintiff.  (R. 1336-62).  Plaintiff filed exceptions to the ALJ's decision with the Appeals Council, which denied review on March 12, 2025, (R. 1323-30), thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.

On May 11, 2025, Plaintiff filed the instant complaint in this Court and consented to my jurisdiction pursuant to 28 U.S.C. § 636(C) two days later.  (Compl., ECF No. 1; Consent Order, ECF No. 4).  On October 23, 2025, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 12).  The Commissioner filed a Response on November 21, 2025, and on December 19, 2025, Plaintiff filed a Reply.  (Resp., ECF No. 13; Reply, ECF No. 16).

## II.     FACTUAL BACKGROUND

The Court has reviewed the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on June 21, 1968, making her 29 years old as of September 13, 1997, her alleged disability onset date. (R. 85). The prescribed period for her applicable claim type (DWB) began on April 30, 2011, and ended on April 30, 2018, at which point she was 49 years and 10 months old. (*Id.*). She has a high school education, completed four years of college courses, and has a history of work as a stage attendant. (R. 249, 1355).

### A.    Medical Evidence

On September 13, 1997, Plaintiff was struck in the head by a steel rod, resulting in chronic migraines and other long-term neurological issues from which she still suffers. (*See, e.g.*, R. 399, 424).

### 1.    Physical Impairments

On December 12, 2002, Plaintiff presented to Randall Berliner, M.D., of The Headache & Research Institute in New York. (R. 424). Plaintiff relayed the events of her accident and reported that her husband found her "awake but confused." (*Id.*). At the visit, she complained of constant "debilitating" headaches, tremors on her right side, short-term memory loss, stuttering, fatigue, word-finding difficulty, imbalance, difficulty concentrating, tunnel vision, difficulty with depth perception, photophobia, and phonophobia. (*Id.*). According to her, her "most troubling symptoms" were her headaches, tremors, fatigue, and memory loss. (*Id.*). She reported that the chronic headaches occurred behind her right eye and radiated into the temporal areas, occasionally migrating to the left side. (*Id.*). She occasionally experienced nausea and vomiting in association with her headaches when they were more "severe," and she noted that physical activity, fatigue, and changes in barometric pressure tended to bring them on. (*Id.*). She also stated that without a midday nap, she would experience headaches and fatigue. (*Id.*). As for the tremors, they started about five days after the accident and would begin in her jaw and radiate

down through her arm and hip, although she had "gained a great deal of control over [them] by focusing and holding herself still." (*Id.*). She endorsed "a flattening affect since the injury" but denied any emotional lability. (*Id.*).

During a return visit to Dr. Berliner on February 11, 2003, Plaintiff complained of difficulty sleeping and pain in both arms and reported that her headaches were not improving. (R. 674). Based on this, Dr. Berliner recommended changing her medication. (*Id.*). At another follow-up visit on August 12, 2003, she reported that her headaches were "better" and that she only required Soma—a prescription muscle relaxant used for short-term pain relief—once the prior month. (R. 676). She also noted that her insurance would no longer pay for Adderall; Dr. Berliner prescribed her Concerta instead. (*Id.*). At a September 18, 2003, follow-up visit, Plaintiff noted she did not feel "as well" with Concerta as she did when taking Adderall. (R. 677).

Plaintiff treated with Leon Stephen Kranzler, M.D., for her migraine issues between 2004 and 2014. On May 23, 2004, Dr. Kranzler assessed Plaintiff with post-concussion syndrome and a TBI. (R. 400). Throughout the remainder of their treating relationship, Dr. Kranzler also assessed her with migraines without aura and posttraumatic headaches. (*See, e.g.*, R. 381, 402, 405). Upon examination in May 2004, Dr. Kranzler noted Plaintiff to be in no apparent distress, alert, and oriented to person, place, and time. (R. 400). Her cranial nerves II through XII were intact, her motor exam was 5/5 without drift, and her muscle tone and gait were normal. (*Id.*). Dr. Kranzler observed, however, that she displayed occasional word-finding difficulty, intermittent lower jaw and chin tremors, and irregular sustention tremors in her right arm. (*Id.*). Plaintiff again reported feeling worse while taking Concerta instead of Adderall. (*Id.*). She also reported that Darvocet had been helpful in the past in treating her headaches. (*Id.*). Over the

4

next decade, Plaintiff's physical and mental examination findings were largely unremarkable and she reported that certain medications—including Adderall, Gabapentin, Darvocet, Fioricet, and Neurontin—helped to relieve her symptoms related to her tremors and headaches.  (*See, e.g.*, R. 380-85, 401-10, 416-17).  However, Dr. Kranzler opined in September 2005 and May 2011 that Plaintiff was severely limited in her ability to walk due to her arthritis and neurological conditions.  (*See* R. 518, 573).

Plaintiff treated with Alyssa Carlson, M.D., of Dakota Ridge Family Medicine in Boulder, Colorado.  On June 15, 2016, Plaintiff reported that her physical therapy sessions had been going "really well" and that she was learning to allow her arms and body to relax.  (R. 869). However, the pain in her jaw persisted and she experienced pain in her right hip and knee when she walked "a lot."  (*Id.*).  Plaintiff reported that Fioricet capsules helped relieve the symptoms associated with her migraines, but stated that she did not take them two days in a row in order to prevent rebound headaches.  (*Id.*).  She was also taking Adderall capsules at this time.  (R. 872). Throughout the course of their treating relationship, Dr. Carlson frequently noted Plaintiff: to have normal cognitive functioning, mood, affect, appearance, and gait; displayed the ability to stand without difficulty; and showed no signs of tremors.  (*See, e.g.*, R. 872, 875-77, 881, 886, 909, 915-16, 924, 948, 967, 972, 977).

On April 21, 2021, Dr. Carlson opined regarding the extent of Plaintiff's impairments both at present and during the applicable disability period.  (R. 1223-26).  She noted Plaintiff's relevant diagnoses, including a TBI, cognitive dysfunction, chronic migraines, generalized arthritis, a visual field deficit, and ADHD.  (R. 1223).  She anticipated Plaintiff would continue to experience ongoing symptoms related to her impairments given that over the course of their five-year treating relationship Plaintiff had shown no marked improvement or significant

5

progression.  (*Id.*).  As for Plaintiff's headaches specifically, she noted that Plaintiff experienced "constant" mild headaches with "severe" headaches with photophobia occurring two to three times weekly.  (*Id.*).  She determined that: Plaintiff's symptoms would frequently interfere with the attention and concentration required for simple work tasks; she could walk and stand for 10 to 15 minutes at a time before experiencing pain, sit for 60 minutes at a time and a total of two hours per day, stand or walk for less than two hours total in a day, and would occasionally need to take unscheduled breaks twice per workday; she could lift 20 pounds rarely and 10 pounds occasionally; she could frequently twist, stoop, bend, and climb stairs and rarely crouch and squat; she had significant limitations reaching, handling, and fingering; and that she would miss work more than four days per month due to these limitations.  (R. 1224-25).  Dr. Carlson also noted that Plaintiff required the use of a cane "as needed."  (R. 1226).  She reaffirmed this opinion on November 28, 2023.  (R. 1633).

Michael Greher, Ph.D., provided a neuropsychological evaluation of Plaintiff on May 27, 2016.  (R. 740-48).  During the evaluation, Plaintiff reported she: had memory and word-finding difficulties; had right-sided tremors that she attributed to her accident; had lost significant cognitive functioning; no longer had peripheral vision; suffered significant abuse between the ages of two and 11, including emotional, physical, and sexual abuse; and had sought and received psychotherapy at various times throughout her adolescent and adult life.  (R. 741). Greher noted Plaintiff's past medical history and procedures, which included: possible electroencephalogram asymmetry, albeit with no formal epilepsy diagnosis; extensive treatment for jaw pain and hemi-body tremors; therapy for emotional dysregulation, ADHD, confusion, anxiety, and depression; CT scans and MRIs that showed no neurological abnormality, but a PET scan that purportedly showed "global pathology" according to Plaintiff; and myriad cognitive

functioning tests administered to Plaintiff since 1997.  (R. 742).  He observed that Plaintiff: was oriented to person and place, but not time; was alert and well-groomed, though appeared drowsy as the evaluation progressed; ambulated normally, albeit with occasional right-sided tremor; displayed euthymic affect with fast and talkative speech; had tangential thought processes, having to be "redirected" on multiple occasions; and was cooperative and displayed an ability to follow instructions.  (R. 742).  Neuropsychological tests administered by Greher revealed Plaintiff had: high average intellectual function; average to above average executive, language, and visuospatial functions; normal learning and memory skills; and above average fine motor speed and dexterity, bilaterally.  (R. 742-43).

Ultimately, Greher opined that Plaintiff's "neurocognitive profile was quite normal across domains" and that her test results "suggest[ed] that, despite her complaints and neurological history, [Plaintiff was] functioning extremely well from a cognitive perspective." (R. 743).  He had trouble determining whether Plaintiff's TBI should be characterized as mild, moderate, or severe, but ultimately opined that that classification did not matter given how well Plaintiff was doing "from a cognitive point of view."  (*Id.*).  In coming to these conclusions, Greher relied upon the "absence of positive findings on neuroimaging [and] her hospital course (which resulted in a discharge the day after the event and not an initial, more extended hospital stay)."  (*Id.*).

Plaintiff treated with Alexander Feldman, M.D., beginning in 2020.  (R. 1128).  On April 12, 2021, Dr. Feldman, completed a medical source statement (R. 1128-30).  He assessed that Plaintiff suffered chronic migraines with aura, mental confusion, malaise, visual disturbance, difficulty concentrating, nausea, mood symptoms, and sleepiness.  (R. 1128).  He was unsure

7

whether these impairments had lasted since November 18, 2017,[1] but noted that he expected they would last in the future for at least 12 months. (R. 1129). He explained that she had daily mild headaches with seven or eight bad headaches each month, and that bright lights and noise exacerbated her symptoms. (R. 1128). He opined that Plaintiff would need unscheduled breaks every two hours in a workday and that she would likely be absent from work four times per month due to her impairments or treatment. (R. 1129-30). He specifically limited Plaintiff from working in loud, bright environments. (R. 1130).

### 2.    Mental Impairments

Plaintiff treated with Christine Martinez, M.A., L.P.C., for her mental health issues during her time in Colorado. On March 10, 2021, Martinez opined as to how Plaintiff's mental health issues would affect her functionality. (R. 1100). Martinez described Plaintiff as "likable" and "highly intelligent" with "the capacity of openness, empathy, and self-awareness." (*Id.*). Nevertheless, Martinez noted that Plaintiff occasionally struggled with word-finding and would lose track of dialogue. (*Id.*). Martinez also noted that Plaintiff occasionally had to end her therapy sessions early due to debilitating migraines. (*Id.*). Martinez diagnosed Plaintiff with generalized anxiety disorder and depression. (*Id.*). She opined that Plaintiff was unable to meet competitive standards in her ability to: respond appropriately to changes in a normal work setting; maintain an awareness of normal hazards and take appropriate precautions in a normal work setting; get along with coworkers without distracting them or exhibiting behavioral extremes; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. (R. 1103). She further opined that Plaintiff had

---

[1] The form opinion Dr. Feldman provided had a checkbox inquiring whether Plaintiff's impairments had lasted since November 18, 2017. (R. 1129). It is unclear what the significance of this date was, but in any event Dr. Feldman noted he was unsure. (*Id.*).

Category IV limitations[2] in: remembering locations and work-like procedures; understanding and remembering detailed instructions; carrying out any instructions; maintaining attention and concentration for extended periods of time; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; and performing at a consistent pace without an unreasonable number and length of rest periods. (R. 1102). Moreover, she opined that Plaintiff had Category III limitations[3] in her ability to: understand and remember very short and simple instructions; and make simple work-related decisions. (R. 1102). Ultimately, based on her impairments Martinez opined that Plaintiff would miss five days or more of work per month and would be off task more than 30 percent of the time. (R. 1102, 1104).

State agency psychiatric consultant Anne Naplin, Ph.D., provided an evaluation of Plaintiff's mental capabilities on March 5, 2020, opining that Plaintiff had no more than mild limitations in each of the four "Paragraph B" mental function areas. (R. 91-92). State agency psychiatric consultant Gayle Frommelt, Ph.D., offered similar findings on reconsideration. (R. 108).

### B.    Non-Medical Evidence

Plaintiff completed two adult function reports—in January and July 2020—as well as a vision questionnaire (also in July 2020). (R. 288-97, 306-14). In the January 2020 report, Plaintiff stated that: loud noises and bright lights triggered her frequent migraines and short-term

---

[2] Martinez defined Category IV limitations as precluding performance for 15 percent or more of an eight-hour day. (R. 1101).

[3] Martinez defined Category III limitations as precluding performance for 10 to 15 percent of an eight-hour day. (R. 1101).

memory problems; her ADHD made it difficult to stay on task; arthritis and chronic pain limited her activity levels; and she tired easily. (R. 288-93). Regarding her daily activities, Plaintiff reported she: enjoyed reading, walking around her neighborhood, painting, and crocheting; cleaned the house, did laundry, cooked meals every day, and washed the dishes; took care of her pets; shopped for groceries and household items; and attended dance class weekly. (R. 288-92). However, she no longer drove due to her limited eyesight. (R. 291). She reported that she could walk one mile before needing to stop and rest, used a cane, could follow written but not spoken instructions well, and got along well with authority figures so long as they understood her limitations, but that she did not handle stress or changes in routine well. (R. 293-94). Ultimately, she reported that her impairments affected her ability to lift, squat, stand, kneel, see, remember, complete tasks, concentrate, and understand, and noted that she easily became unbalanced and had difficulty moving due to her chronic pain. (R. 293).

In her July 2020 report, she endorsed more significant limitations, including: that she was "not very functional" until she takes her medication; that her tremor made certain personal care tasks difficult; that she only prepared one meal for herself on a "good day" and that she did not cook or do household chores on bad days; and that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and use her hands. (R. 306-11). She also noted that although Fioricet helped with her symptoms, she nevertheless suffers rebound headaches as a side effect. (R. 313). Finally, in her July 2020 vision questionnaire she noted that she experiences "pressure" in her vision and has problems refocusing and no peripheral vision. (R. 314).

Plaintiff testified at the December 20, 2023, administrative hearing regarding the extent of her impairments and how they affected her ability to function. (R. 1371-94). She testified that while in Colorado she treated with the neurology clinic where Dr. Carlson practiced. (R. 1371-72). Plaintiff testified that her medications caused her significant side effects, including dry mouth, constipation, drowsiness, fatigue, and rebound headaches. (R. 1372-73). Further, according to her, none of her medications reduced the frequency or severity of her headaches, which occurred daily, vacillated in severity, and at times resulted in nausea, vomiting, and an inability to function.[4] (R. 1373). The more severe migraines with associated nausea occurred multiple times per week. (R. 1379-80). Plaintiff noted several triggers for her migraines including low barometric pressure, bright or flickering lights, loud ambient sounds, and stress or anxiety. (R. 1374). A typical day for her included walking her dog, preparing lunch and dinner for herself, making lists as to what chores had to be accomplished, doing one of her preferred hobbies (reading, crocheting, painting, or watching television), and performing various household chores. (R. 1375-77). Plaintiff required the use of a cane and noted that she had had several falls throughout the duration of the prescribed period. (R. 1387).

Plaintiff testified that at various times throughout the applicable prescribed period she fostered several children. (R. 1377). According to her, her daughter was the "main certified person," and she was "secondary." (R. 1378). She noted that her daughter worked at the University of Colorado at that time, however, so some of the caretaking fell to her. (R. 1378-79). Finally, Plaintiff testified that she had numerous "trauma-based" psychological issues that stemmed from abuse she had suffered as a child. (R. 1389).

---

[4] Notwithstanding this, Plaintiff subsequently testified that Fioricet was effective in treating her headaches. (R. 1380).

Plaintiff's daughter also testified at the hearing, stating: she lived with her mother in Colorado from 2016 to 2018; she observed firsthand her mother's migraines; during the more severe bouts, she noted her mother spent most of the day in a dark room and had fits of vomiting and nausea; she mostly drove her mother to all her appointments given her mother's visual and neurological impairments; and her mother had illogical emotional reactions to different triggers in her life.  (R. 1394-960).  She noted that the more severe migraines occurred once or twice per week.  (R. 1395).

### III.    ALJ'S DECISION

Following the administrative hearing, the ALJ issued a decision in which he made the following findings:

1.    It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50.  The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.

2.    The prescribed period ended on April 30, 2018.

3.    The claimant has not engaged in substantial gainful activity since September 13, 1997, the alleged onset date (20 C.F.R. 404.1571 *et seq.*).

4.    Through the prescribed period end date, the claimant had the following "severe" impairments: post-concussion syndrome with migraines, spine disorders, obesity, and osteoarthrosis and allied disorders (20 CFR 404.1520(c)).

5.    Through the prescribed period end date, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one

of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

6. After careful consideration of the entire record, the undersigned finds that through the prescribed period end date, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could operate hand controls with the right hand occasionally. She could handle and finger items frequently with the right hand. She could never climb ladders, ropes, or scaffolds. She could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She could never work at unprotected heights or with moving mechanical parts. She could only work in a quiet work environment. She needed to work in an environment where the lighting was no brighter than in a typical office. She could only perform tasks that did not require peripheral vision.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

8. The claimant was born on June 21, 1968 and was 29 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

9. The claimant has at least a high school education (20 CFR 404.1564).

10. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

12.     The claimant was not under a disability, as defined in the Social Security Act,

from September 13, 1997, through April 30, 2018 (20 CFR 404.1520(g)).

(R. 1342-56).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 1356).

## IV.     LEGAL STANDARD

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to

the Commissioner that she cannot engage in substantial gainful activity because of a medically

determinable physical or mental impairment that can be expected to result in death or that has

lasted or can be expected to last for a continuous period of at least twelve months.  42 U.S.C. §§

402(e) *et seq.*, 423(d)(1)(A); 20 C.F.R. §§ 404.331, 404.336, 404.1505(a); *Barnhart v. Walton*,

535 U.S. 212, 214 (2002).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity.  If [s]he is not,
> then the Commissioner considers in the second step whether the
> claimant has a "severe impairment" that significantly limits [her]
> physical or mental ability to perform basic work activities.  If the
> claimant suffers a severe impairment, the third inquiry is whether,
> based on the medical evidence, the impairment meets the criteria
> of the impairment listed in the "listing of impairments," . . . which
> result in a presumption of disability, or whether the claimant
> retains the capacity to work.  If the impairment does not meet the
> criteria for a listed impairment, then the Commissioner assesses in
> the fourth step whether, despite the severe impairment, the
> claimant has the residual functional capacity to perform [her] past
> work.  If the claimant cannot perform [her] past work, then the
> final step is to determine whether there is other work in the
> national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. § 404.1520.  The

disability claimant bears the burden of establishing steps one through four.  If the claimant is

determined to be unable to resume previous employment, the burden shifts to the Commissioner

at step five to establish that, given the claimant's age, education, work experience, and mental

and physical limitations, she is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.     DISCUSSION

In her request for review, Plaintiff contends that the ALJ erred in five respects, including: (1) failing to find that Plaintiff's chronic migraines were medically equivalent to a listed impairment—specifically Listing § 11.02B, epilepsy or seizures; (2) rejecting the opinions of Plaintiff's treating physicians—Drs. Carlson, Feldman, and Kranzler; (3) rejecting the opinion of Plaintiff's treating licensed professional counselor, Christina Martinez; (4) failing to include all of Plaintiff's credibly established limitations in the RFC and hypothetical question posed to the VE; and (5) mechanically applying the rules and regulations applicable to Plaintiff's case. (Pl.'s Br., ECF No. 12, at 4-29).

### A.    Listing § 11.02B

#### 1.    The Parties' Arguments

Plaintiff first argues that the ALJ erred by failing to find that her migraines equaled Listing § 11.02B in severity.  (*Id.* at 4).  As noted by Plaintiff, SSR 19-4p, 2019 WL 4169635 (Aug. 26, 2019) expressly recognizes that migraines and other headache disorders are most akin to Listing § 11.02B and may medically equal this listing, thereby resulting in a finding of disability at this step.  (*Id.* at 4-7).  The ALJ undertook the relevant analysis regarding whether Plaintiff's migraine disorder medically equaled Listing § 11.02B, ultimately finding that her migraines did not occur "with the required frequency and severity despite adherence to prescribed treatment" to meet the requirement of the listing (i.e., that they occur at least weekly).  (R. 1345).  She contends that in coming to this conclusion, the ALJ improperly weighed the relevant evidence.  First, Plaintiff highlights that the ALJ actually acknowledged she experienced migraines between one and two times weekly.  (Pl.'s Br., ECF No. 12, at 7 (citing R. 1345)).  She argues that the ALJ improperly discounted this evidence because she overemphasized reported improvement in Plaintiff's migraines from physical therapy.  (*Id.* (citing R. 1259, 1272)).  Second, she argues that the ALJ ignored the fact that "one day after the physical therapy note he cited, on June 15, 2016, Plaintiff was still required to take her Fioricet medication 15/30 days in a month because of the continuing frequency of her migraines and had to refrain from taking it two days in a row to prevent rebound headaches."  (*Id.* (citing R. 869)).  Third, she argues that the clinical notes from her treating neurologists also support the conclusion that she experienced migraines multiple times per week.  (*Id.*).  Plaintiff contends that taken together, this evidence indicates that, notwithstanding improvement with therapy, she continued to have severe migraines at least weekly—the required frequency under Listing § 11.02B and SSR 19-4p.  (*Id.*).

16

The Commissioner responds that substantial evidence supported the ALJ's determination that, although Plaintiff experienced migraines, the record evidence demonstrated that physical therapy and certain medications decreased the frequency at which she experienced them, thereby rendering the impairment inconsistent with Listing § 11.02B.  (Resp., ECF No. 13, at 6-7).

###    2.    Analysis

I agree with the Commissioner that Plaintiff's arguments amount to a mere disagreement with the ALJ regarding how much weight to assign the record evidence and whether substantial evidence supported the ALJ's determination.  *See Perkins v. Barnhart*, 79 F. App'x 512, 514-15 (3d Cir. 2003) ("[The claimant's] argument here amounts to no more than a disagreement with the ALJ's decision, which is soundly supported by substantial evidence.").  For that reason, I deny relief on this ground.

At step three, the ALJ analyzes whether a claimant's impairments or combination of impairments meet or medically equal one of the listings that prevent an adult, regardless of age, education, or work experience, from performing any gainful activity.  20 C.F.R. § 404.1525(a). This inquiry identifies those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background, making further inquiry unnecessary. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).  The claimant bears the burden of producing medical findings showing her impairments meet or medically equally a listed impairment.  *See Burnett*, 220 F.3d at 120 n.2.  To meet this burden, the claimant must establish all the requirements of the relevant listing.  *Sullivan*, 493 U.S. at 530 (claimant who meets only some of the listing requirements, "no matter how severely, does not qualify"); *see also Hartung v. Colvin*, No. 12-6155, 2016 WL 2910096, at *5 (E.D. Pa. May 19, 2016).  Meeting a listing cannot be based on diagnoses alone.  20 C.F.R. § 404.1525(d).  Because matching or equaling a listing at

17

step three results in an automatic finding of disability, the listings are strictly construed against claimants. *See Sullivan*, 493 U.S. at 530-32. At step three, the ALJ must "actually evaluate the evidence, compare it to the Listing, and give an explained conclusion, in order to facilitate meaningful review." *Reynolds v. Comm'r of Soc. Sec.,* 424 F. App'x. 411, 416 (6th Cir. 2011) (internal quotations omitted); *see also Burnett*, 220 F.3d at 120 (ALJ must provide sufficient detail in his opinion to facilitate judicial review).

In this case, Plaintiff and the ALJ identified and considered Listing § 11.02B,[5] 20 C.F.R. Pt. 404, Subpt. P. App. 1 § 11.02B, but the ALJ found Plaintiff's impairments were not severe enough to meet or medically equal that listing. (R. 1344-46). Regarding Listing § 11.02B, the ALJ concluded:

> Although there is no listing directly applicable to [Plaintiff's] migraines, the effects of [Plaintiff's] migraines have been separately evaluated in conjunction with the guidance provided by Social Security Ruling (SSR) 19-4p for primary headache disorders. SSR 19-4p directs that [Plaintiff's] migraines be considered to determine if they alone or in combination with another impairment(s), medically equals a listing. [Plaintiff's] migraines have been evaluated to see if they medically equal listing 11.02 (epilepsy), as that is the most closely analogous listed impairment for an MDI of a primary headache disorder. Listing 11.02 requires evidence of dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. However, the evidence fails to demonstrate that [Plaintiff's] migraines occur with the required frequency and severity despite adherence to prescribed treatment.
>
> The records note [Plaintiff] to experience migraines 1-2 times per week. However, as further discussed below, [Plaintiff] has reported significant improvement in her migraines from the use of medications, such as Fioricet, as well as through the use of physical therapy. [Plaintiff] reported improvement in her migraines from use

---

[5] The ALJ also referenced subsection Listing § 11.02D (epilepsy) in his decision, but Plaintiff does not dispute the ALJ's analysis with respect to that subsection. Thus, only Listing § 11.02B is discussed here.

> of Fioricet on multiple occasions. [Plaintiff] was also noted to have steady improvement in regard to decreasing the frequency and severity of her headaches and decreasing the amount of medication she used through the use of physical therapy.

(R. 1345) (record citations omitted) (alterations added).

In his decision, the ALJ determined that Plaintiff did not establish the frequency of migraines—once per week—necessary to medically equal the requirements of Listing § 11.02B. The ALJ pointed to record evidence, including Plaintiff's own reports, that medication and physical therapy reduced the frequency of her migraines. (*Id.*). I find that the ALJ's step three conclusion was supported by substantial evidence in the record.

Plaintiff's contentions on this point amount to a mere disagreement with the ALJ regarding how much weight to assign the varying pieces of evidence in the record. *See Perkins*, 79 F. App'x at 514-15; *Markoch v. Comm'r of Soc. Sec.*, No. 1:20-CV-00417, 2020 WL 7586953, at *4-5 (D.N.J. Dec. 22, 2020) ("It is Plaintiff's burden to establish the severity of her impairments, and Plaintiff's challenge to the ALJ's consideration of her non-severe impairments amounts to mere disagreement with his analysis rather than showing any substantive error."); *see also Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) ("Surveying the medical evidence to craft an RFC is part of the ALJ's duties."). The ALJ cited several instances in the record, including Plaintiff's own statements, that indicated physical therapy and medications decreased the frequency of Plaintiff's migraines to the point where they were occurring less than once per week. (*See* R. 1345 (citing R. 406, 869, 1259, 1272)). For instance, Plaintiff reported multiple times throughout the prescribed period that Fioricet helped with her headaches; on May 27, 2016, Plaintiff reported her headaches had decreased in frequency with physical therapy; and on September 11, 2018, Plaintiff reported that her headaches were less frequent while living in

Colorado and that she "[could] go [two] weeks without a [headache]." (*See, e.g.*, R. 406, 869, 921, 1272).

These records constitute substantial evidence supporting the ALJ's finding that Plaintiff's migraines did not medically equal Listing § 11.02B. *Burnett*, 220 F.3d at 118 (substantial evidence is "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate").  To the extent that Plaintiff contends that she still had to take Fioricet every other day due to the ongoing frequency of her migraines, that she would have taken it more often but it caused rebound headaches, and that this demonstrated that she met the "once a week" threshold even with her improvement, (Pl.'s Br., ECF No. 12, at 7 (citing R. 60-61, 401-17, 869, 1074-78, 1373-74, 1379-80, 1389-90)), Plaintiff's contentions amount to a mere disagreement with the ALJ as to how to weight the record evidence.  Given the above evidence—including that Plaintiff self-reported that her headaches had decreased to less than once per week—it was reasonable for the ALJ to conclude that physical therapy and medications reduced the frequency of Plaintiff's migraines to less than weekly, the required frequency under Listing § 11.02B.

### B.      Plaintiff's Remaining Arguments

#### 1.      The Parties' Arguments

Plaintiff's remaining arguments amount to challenges regarding whether substantial evidence supported the ALJ's evaluation of the relevant medical evidence and his subsequent RFC finding.  Given the related nature of these arguments, I address them together.

Plaintiff first argues that the ALJ erred in his evaluation of the medical opinions of Dr. Carlson, Dr. Feldman, Martinez, and Dr. Kranzler.[6]  (Pl.'s Br., ECF No. 12, at 9-23).  Regarding

---

[6]  It is unclear whether Plaintiff lodges a standalone claim of error regarding the ALJ's treatment of Dr. Kranzler's opinions, or whether she merely references it as record evidence consistent with the three other opinions.  (*See* Pl.'s Br., ECF No. 12, at 16-18 (discussing Dr.

Dr. Carlson's opinions,[7] Plaintiff contends that in finding them only partially persuasive, the ALJ

failed to consider certain supporting explanations offered by the doctor. (*Id.* at 14). She also

posits that the more severe limitations contained in the opinions were consistent with other

record evidence, namely: clinical notes during the relevant period consistently showing Plaintiff

experienced migraines one to two times per week; her diagnoses of post-concussion syndrome as

well as arthritis with chronic pain; the fact that she could not take Fioricet two days in a row for

fear of rebound headaches; the opinions of Dr. Feldman and Martinez indicating more severe

physical and mental limitations; and the hearing testimony of both Plaintiff and her daughter.

(*Id.* at 13-15). As for Dr. Feldman's opinion, Plaintiff argues that the ALJ impermissibly

dismissed the opinion as irrelevant and did not consider it at all. (*Id.* at 16). Concerning

Martinez's opinion, Plaintiff contends that: (1) the ALJ stated he was unable to make any finding

regarding persuasiveness because Martinez refused to provide treatment records to the ALJ; (2)

she nevertheless provided a letter to the ALJ containing supporting explanations for her opinion,

which Plaintiff asserts the ALJ also failed to consider; and (3) the ALJ impermissibly relied upon

the fact that Martinez was not an acceptable medical source under the regulations as an

additional reason to discount her opinion. (*Id.* at 21-23). Plaintiff argues that notwithstanding

the nature of Martinez's opinion or her failure to send treatment notes pertaining to her care of

---

Kranzler's opinion, noting that his findings demonstrated "a high degree of consistency with and
support for the opinions of Dr. Carlson, Dr. Feldman, and Ms. Martinez," and asserting that the
ALJ "violated the regulation" by failing to "*explain* why an opinion is consistent or not
consistent, not simply summarize the other evidence in the record and let the reader decide
whether the opinion is consistent with it") (emphasis in original)). However, this ambiguity does
not matter, as even if she does advance a standalone claim, substantial evidence supported the
ALJ's treatment of Dr. Kranzler's opinion.

[7] Dr. Carlson provided two medical opinions regarding Plaintiff's functionality—one in
April 2021 and another in November 2023 reaffirming it. (R. 1223-26, 1633).

Plaintiff, the ALJ was still required to consider the opinion. (*Id.* at 23). And turning to Dr. Kranzler's opinions,[8] Plaintiff simply notes that they were consistent with the opinions of Drs. Carlson and Feldman, and that all four opinions should therefore have been accepted by the ALJ. (*Id.* at 18-19).

Building off of these arguments, Plaintiff then contends that the aforementioned errors in evaluating the medical evidence led the ALJ to make an improper RFC determination and ultimately pose an improper hypothetical question to the VE that did not accurately articulate the full extent of Plaintiff's limitations. (*Id.* at 24).

Finally, Plaintiff contends that had the ALJ correctly formulated the RFC and found that she could perform only sedentary work—not light work, as the ALJ found—a non-mechanical application of the regulations based on her age and RFC would have necessitated a finding of disability based on certain grid requirements. (*Id.* at 24-29).[9]

---

[8] Dr. Kranzler provided medical opinions in June 2005 and in May 2011 regarding Plaintiff's functionality. (R. 145, 200).

[9] Specifically, Plaintiff argues that: (1) the Secretary of Health and Human Services promulgated the Medical-Vocational Guidelines (grids) in 1978 in an effort to "improve both the uniformity and efficiency" of disability determinations, (Pl.'s Br., ECF No. 12, at 24 (quoting *Sykes*, 228 F.3d at 263)); (2) the grids "consist of a matrix of four factors—physical ability, age, education, and work experience" that, in conjunction with a claimant's RFC, work to direct ALJs whether jobs exist in significant numbers in the national economy that a claimant can perform, (*id.* at 25 (quoting *Sykes*, 228 F.3d at 264)); (3) in certain circumstances, an ALJ may decide whether a claimant is disabled using the grids, (*id.* at 26 (*citing Roman v. Apfel*, 24 F. Supp. 2d 263, 275 (D. Conn. 1998)); (4) "[t]he regulations provide that the Commissioner will not apply the age categories mechanically in a 'borderline situation'" wherein "there would be a shift in results caused by the passage of a few days or months," (*Id.* at 26 n.7 (quoting 20 C.F.R. § 404.1563(a); SSR 82-46C, 1982 WL 31427 (Jan. 1, 1982)))); (5) such a "borderline situation" exists here, as, on April 30, 2018—the last day of the prescribed period—Plaintiff would have been only two months shy of being classified as a person closely approaching advanced age (ages 50-54) under the regulations, (*id.* at 26-29 (citing 20 C.F.R. § Pt. 404, Subpt. P, App. 2, § 201.12); Reply, ECF No. 16, at 6); (6) had Plaintiff been considered a person closely approaching advanced age under the grid formula, the ALJ would have been directed under the grids to find her disabled, (Pl.'s Br., ECF No. 12, at 24-29; Reply, ECF No. 16, at 6); and (7)

22

The Commissioner responds that the ALJ correctly considered the medical evidence and simply drew different conclusions than what Plaintiff would have preferred. (Resp., ECF No. 13, at 8). With respect to the ALJ's treatment of Dr. Carlson's opinions, the Commissioner contends that the ALJ noted Dr. Carlson's own treatment records did not fully support the more severe limitations contained in her opinions, including her notation that Plaintiff reported improved functioning with medication, as well as grossly normal examinations indicating she was in no acute distress, did not exhibit active tremors, walked with a normal gait, had the ability to stand without difficulty, and had normal cognitive functioning, mood, and affect. (*Id.* at 9 (citing R. 822, 844, 850-57, 871-72, 925, 928, 933, 936, 979, 1353)). The Commissioner also highlights that the ALJ noted Dr. Carlson's opinions were not consistent with neuropsychological testing, other record evidence indicating that her symptoms improved with treatment, or her activities of daily living (ADLs). (*Id.* (citing 1353)).

Regarding his treatment of Dr. Feldman's opinion, the Commissioner argues that it was permissible for the ALJ to consider the opinion, correctly note that it did not pertain to Plaintiff's level of functioning during the prescribed period, and therefore find that it was not relevant to making the RFC determination. (*Id.* (quoting R. 1354) (alterations in original)).

---

therefore, given her proximity to the new age category and how it would have affected the result here, the ALJ should not have applied the grids in such a mechanical fashion but instead should have considered Plaintiff a person closely approaching advanced age and found her disabled, (Pl.'s Br., ECF No. 12, at 24-29; Reply, ECF No. 16, at 6)). Plaintiff's arguments on this point are also predicated on her earlier claim that she was at most only capable of sedentary work, consistent with the opinions of Dr. Carlson and others, which the ALJ allegedly rejected in error. (*Id.* at 26-29). But because this Court disagrees that those opinions were improperly rejected, as set forth more fully below, it does not address her specific "grid" arguments flowing from that hypothesis.

As for the ALJ's treatment of Martinez's opinion, the Commissioner asserts that the ALJ *did* in fact consider the opinion but ultimately found it unpersuasive. (*Id.* at 10 (citing R. 1352)). The Commissioner contends that the ALJ correctly noted that a supportability analysis was impossible given that Martinez did not provide her treatment records. (*Id.* (citing R. 1353)). Next, he observes that substantial evidence supported the ALJ's finding that the opinion was not consistent with certain record evidence, including: largely normal neuropsychological testing results; the fact that Plaintiff reported improved functioning with treatment; and Plaintiff's ADLs. (*Id.* at 10-11 (citing R. 1353)). Moreover, the Commissioner highlights that the ALJ noted the opinion was rendered nearly three years after the end of the prescribed period and failed to specifically address Plaintiff's functioning during the relevant time.[10] (*Id.* at 11 (citing R. 1353)).

Ultimately, while acknowledging the traumatic nature of Plaintiff's 1997 accident, the Commissioner maintains that the record evidence supported the ALJ's decision to reject, in part or in full, the aforementioned opinions, and that it further supported his RFC determination. (*Id.* at 11-12). He maintains that no additional analysis was needed given the ALJ's reasonable factual findings and appropriate reliance upon the VE's testimony in finding that a significant number of jobs existed in the national economy that Plaintiff could perform. (*Id.* at 12).

In her Reply, Plaintiff reiterates her original arguments and adds that the Commissioner failed to address her final contention related to the mechanical application of 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.12, "effectively conceding it." (Reply, ECF No. 16, at 1-6).

---

[10] The Commissioner did not specifically address the ALJ's treatment of Dr. Kranzler's opinions, but, again, it is unclear whether Plaintiff brings a standalone claim regarding the evaluation of it. (*See, supra*, n.5).

### 2.    Analysis

I agree with the Commissioner that Plaintiff's remaining arguments, like his first, amount to a mere disagreement regarding how much weight to accord the record evidence, including the medical opinions, *see Perkins*, 79 F. App'x at 514-15, and that substantial evidence supported the ALJ's determinations regarding their persuasiveness as well as the ultimate RFC determination.  For that reason, I deny relief on Plaintiff's remaining arguments, too.

The ALJ is responsible for fashioning a claimant's RFC.  A claimant's RFC is what he can still do despite his established impairments.  20 C.F.R. § 404.1545(a)(1).  In making an RFC determination, the ALJ must consider all evidence before him.  *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999).  That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others.  *See Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001); 20 C.F.R. § 404.1545(a).  An ALJ must consider the medical opinions together with the rest of the relevant evidence, and explain the weight given to those opinions in his decision.  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 362 (3d Cir. 2006).  While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."  *Id.* at 361.  When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason."  *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993) (quoting *Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981)).  Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is

adequately articulated.  *See, e.g., Byrd v. Comm'r of Soc. Sec.*, No. 23-4957, 2024 WL 4631645, at *9 (E.D. Pa. Oct. 30, 2024); *Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

The social security regulations "require, an ALJ to offer 'a narrative discussion describing how the evidence supports'" the limitations imposed.  *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019) (citing SSR 96-8P, 1996 WL 374184 at *7 (July 2, 1996)).  An "ALJ 'may not reject [a physician's findings] unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected.'"  *Mason*, 994 F.2d at 1067 (quoting *Kent v. Schweiker*, 710 F.2d 110, 115 n.5 (3d Cir. 1983)); *see also Carter v. Railroad Retirement Bd.*, 834 F.2d 62, 65 (3d Cir.1986).

When evaluating medical evidence, the most important factors are supportability and consistency, and the ALJ must explain how he or she considered these factors for a medical source's medical opinions or prior administrative medical findings in the determination or decision.  20 C.F.R. § 404.1520c(a)-(c).  Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett*, 220 F.3d at 119).

### a.      The Medical Opinions

In evaluating Dr. Carlson's opinions, the ALJ found them to be "slightly persuasive" and stated in pertinent part:

> Dr. Carlson opined that [Plaintiff] is able to sit for 2 hours and stand/walk for less than 2 hours total in an 8-hour workday.  She needs to walk every 60 minutes for 5 minutes.  She needs unscheduled breaks twice a day.  She can rarely lift and carry up to 20 pounds, occasionally up to 10 pounds, and frequently less than 10 pounds.  She can rarely crouch or squat, and frequently perform the remaining postural activities.  She can handle or finger 10% on the right side and 80% on the left side.  She would be absent from

26

work more than 4 days a month.  Dr. Carlson opined that the above limitations apply back as far as September 13, 1997.

These limitations are not entirely supported by this provider's primary care treatment records.  Physical examinations from primary care records are grossly normal and show [Plaintiff] to be in no acute distress, with normal cognitive functioning, no tremors noted, normal mood and affect, normal gait and ability to stand without difficulty.  [Plaintiff] also reported improved functioning with the use of Adderall.

These limitations are also not entirely consistent with the other evidence available at the hearing level, which shows that [Plaintiff] exhibited largely normal findings on neuropsych testing, though with questionable validity, and that many of her symptoms improved with treatment and she was able to perform a significant number of activities of daily living.  Overall, the evidence reasonably supports [Plaintiff] being limited to the extent set forth in the residual functional capacity.

(R. 1353 (alterations added) (record citations omitted)).

In evaluating Dr. Feldman's Opinion, the ALJ found that it did not pertain to Plaintiff's functioning during the prescribed period and was therefore not probative of her functioning during the period at issue.  (R. 1354).

In evaluating Martinez's opinion, the ALJ also observed that it pertained to Plaintiff's functioning after the end of the prescribed period, but went on to evaluate it nonetheless, finding it unpersuasive and stating in pertinent part:

In her letter, []Martinez opined that [Plaintiff] is very intelligent, but yet she often forgot conversations, exhibited word searching difficulties, or lost track of dialogue.  She asserted that "clearly her handicap has left her incapable of functioning within the normal limits of a woman her age."  She also noted that [Plaintiff] is at the whim of her migraines.

In the TBI residual functional capacity statement, []Martinez opined that [Plaintiff] would be unable to perform all mental functional areas 10% of the time or greater, and that she would be off task from a job more than 30% of the time and absent from work 5 or more days per month.

27

> []Martinez did not provide her treatment records, so the undersigned is unable to state that these limitations are supported by this source's own records. However, these limitations are not consistent with the overall evidence available through the end of the prescribed period. [Plaintiff] exhibited largely normal findings on [neuropsychological] testing, though with questionable validity. As evaluated above, many of [Plaintiff's] symptoms improved with treatment. The evidence also shows that [Plaintiff] was able to perform a significant number of activities of daily living during the period at issue. These opinions were also rendered nearly 3 years after the end of the prescribed period, and they fail to specifically address [Plaintiff's] functioning during the period at issue. For all of the reasons discussed throughout this decision, the undersigned find[s] that [Plaintiff's] "severe" impairments are reasonably accommodated by the residual functional capacity limitations. The undersigned finds that [Plaintiff's] mental impairment of neurocognitive disorders caused the claimant no more than minimal functional limitations through the prescribed period end date, and was therefore non-severe within the meaning of the regulations.

(R. 1352-53 (alterations added) (record citations omitted)).

Finally, it is unclear whether Plaintiff states a standalone claim of error regarding the ALJ's treatment of Dr. Kranzler's opinions. Regardless, in evaluating Dr. Kranzler's opinions, the ALJ found them to be "slightly persuasive" and stated in pertinent part:

> Dr. Kranzler opined that [Plaintiff] has a severely limited ability to walk due to arthritic, neurological or orthopedic condition.
>
> These opinions are vague, and they are neither well supported by this provider's treatment records, no[r] consistent with the overall evidence available at the hearing level through the end of the prescribed period. Dr. Kranzler did not note [Plaintiff] to have significant impairment to her gait. He treated [Plaintiff] largely related to her headaches and other post-concussion symptoms. The evidence does not support [Plaintiff] having significant limitations in her ability to walk besides limitation to the light exertional level along with the additional postural limitations set forth in the residual functional capacity.

(R. 1352 (alterations added) (record citations omitted)).

28

The above shows that the ALJ weighed the opinions appropriately alongside the rest of the record evidence and ultimately found them to be at best only partially persuasive to the extent they were consistent with it, particularly given the lack of support in the treatment records from the issuing sources.  The ALJ acknowledged Plaintiff's claim that she has debilitating migraines and tremors, but ultimately found that Plaintiff overstated the severity of her symptoms and that she had the RFC to perform light work with certain limitations.  (R. 1346-47).  Substantial evidence—in the form of the neuropsychological testing administered by Greher indicating Plaintiff was functioning extremely well from a cognitive perspective in May 2016; grossly normal physical evaluations throughout the duration of the prescribed period showing only slight abnormalities in the upper extremities but normal gait with no difficulty standing; Plaintiff's consistent reports that Fioricet, Adderall, and Gabapentin helped relieve her various symptoms related to her tremors and migraines; and her ADLs such as cooking, performing personal care tasks, doing laundry, cleaning, taking care of her dogs, shopping for groceries, paying bills, attending dance class once per week, and helping to care for her foster children—supported this determination.  (*See* R. 1346-54; *cf. Burnett*, 220 F.3d at 118 (substantial evidence is "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate")).  Nothing about this analysis requires remand.

To the extent Plaintiff argues that the ALJ completely failed to mention or consider Dr. Carlson's supporting explanations, (Pl.'s Br., ECF No. 12, at 14), that assertion is belied by the decision.  The ALJ did in fact address the supportability of Dr. Carlson's opinion, ultimately finding that some of her treatment notes undermined the more severe limitations she endorsed.  (R. 1353).  It was within the ALJ's discretion to rely on this portion of Dr. Carlson's treating notes in weighing the supportability of her opinions.  *See Byrd*, 2024 WL 4631645, at *9 (the

29

ALJ may credit only parts of an opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated).  And to the extent Plaintiff argues the ALJ failed to address specific explanations offered by Dr. Carlson – including that Plaintiff experienced migraines associated with nausea once or twice per week during the relevant period, had arthritic flare-ups with chronic pain, was diagnosed with post-concussion syndrome, and was still required to take medication every other day (but not consecutively to avoid rebound headaches), the ALJ clearly considered the opinion generally and noted the supporting evidence he found persuasive along with how consistent the opinion was with other record evidence.  Because an ALJ need not discuss "every tidbit of evidence included in the record," *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004), and mere diagnosis is insufficient to prove disability, *Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) ("A diagnosis of impairment, by itself, does not establish entitlement to benefits under the Act.  Rather, a claimant must show that the impairment resulted in disabling limitations."), Plaintiff's argument as to the evaluation of Dr. Carlson's opinions fails.

Next, to the extent Plaintiff takes issue with the ALJ's determination that Dr. Feldman's opinion was irrelevant given its timing, numerous courts have held that an opinion rendered after the prescribed period, and which gives no indication that it pertains to the claimant's capabilities during that time, may be assigned little to no weight.  *See, e.g.*, *Yost v. Barnhart*, 79 F. App'x. 553, 555 (4th Cir. 2003) (finding an opinion "not relevant to a disability determination" because it "was rendered . . . nearly four months after the date [the claimant] was last insured") (alteration added); *Ward v. Astrue*, No. 3:12-cv-199-REP, 2012 WL 5387679, at *25 (E.D. Va. Oct. 16, 2012) ("The ALJ did not err when he assigned Dr. Khawaja's opinion no weight, because it was rendered over two months after Plaintiff's date last insured."); *Tynes v. Comm'r of Soc. Sec.*,

30

4:10cv146, 2011 WL 6981194, at *8 (E.D. Va. Dec. 12, 2011) (holding that an opinion completed four years after the claimant's date of last insured with no indication that the opinion pertained to the claimant's capabilities during that timeframe could be assigned minimal weight). Here, Dr. Feldman expressly noted that he was unsure whether his findings as to Plaintiff's limitations dated back to November 18, 2017. (R. 1128). Therefore, it was reasonable for the ALJ to find the opinion was not relevant, given the prescribed period began on April 30, 2011, and ended on April 30, 2018. (*See* R. 85).

As for Martinez's opinion, Plaintiff argues that the ALJ abdicated his duty to assess its persuasiveness when he deemed her not an acceptable medical source and allegedly refused to evaluate supportability based on her failure to provide treatment records. (Pl.'s Br., ECF No. 13, at 21-23). In addition, Plaintiff submits that the ALJ did not consider the supporting explanations provided by Martinez in her March 10, 2021, letter. (*Id.* at 22). The Commissioner counters that the ALJ was not required to consider supportability given Martinez's failure to provide the records and that his consistency analysis was backed by substantial evidence. (Resp., ECF No. 13, at 10).

This Court finds nothing in the ALJ's analysis requiring remand. Despite the dispute as to whether Martinez should have provided her treatment records and the impact of her refusal to do so, Plaintiff does not argue that the ALJ should have supplemented the record by procuring that evidence, or that it was necessary for him to properly adjudicate her disability case. (*See generally* Pl.'s Br., ECF No. 12). The mere fact that the ALJ noted Martinez's refusal to submit her treatment records was not in error, nor does it show that the ALJ abdicated his duty to conduct a supportability analysis (as argued by Plaintiff). Although Plaintiff contends that the ALJ failed to consider the March 10, 2021, letter in the context of supportability, (*Id.* at 22-23),

31

that claim is belied by the ALJ's decision, wherein he expressly *did* consider the letter.  (*See* R. 1352-53 (noting the supporting explanations provided by Martinez in her letter but ultimately not crediting them or the functional limitations endorsed by Martinez)).  Here, the ALJ's decision and the record as a whole illustrates that the ALJ evaluated the record evidence he had before him (Martinez's March 10, 2021, residual functional capacity statement and accompanying letter), noted the letter of support and opinion but concluded that he was "unable to state that [the limitations endorsed by Martinez were] supported," weighed that evidence against other record evidence (largely normal findings on neuropsychological testing, the fact that "many of [Plaintiff's] symptoms improved with treatment," and  Plaintiff's ADLs), and ultimately found that the opinion was "unpersuasive."  (R. 1352-53).  This level of analysis does not warrant remand.  Finally, though Plaintiff is correct that the ALJ noted Martinez's opinion was not an acceptable source,[11] the ALJ nevertheless evaluated the persuasiveness of it, rendering any claim on this ground a red herring.  (*Id.*).

And to the extent Plaintiff argues that the ALJ should have found Dr. Kranzler's opinion consistent with the three aforementioned opinions, substantial evidence (as outlined above)

---

[11]  In weighing the medical evidence, the Social Security Regulations differentiate between "acceptable medical sources" and "other sources," or non-acceptable sources.  *See* 20 C.F.R. §§ 404.1502, 404.1513(a), 404.1513(d).  An ALJ may consider non-acceptable sources in assessing a claimant's disability, and may reject or accept the opinion after explaining his reasons for doing so.  *See Hartranft*, 181 F.3d at 361-62 (finding ALJ properly afforded little weight to the opinion of a chiropractor when that opinion was inconsistent with acceptable sources and claimant's own account of his activities); *Weidman v. Colvin*, 164 F. Supp. 3d 650, 663-64 (M.D. Pa. 2015) (finding the ALJ properly afforded no weight to the opinion of a nurse practitioner when the ALJ cited conflict with the medical evidence of record); *cf. Rivera v. Colvin*, No. 14-6176, 2016 WL 1720423, at *6 (E.D. Pa. Apr. 29, 2016) (finding the ALJ erred in affording no weight to the opinion of a nurse practitioner where the ALJ ignored the nurse practitioner's treatment notes from numerous occasions when she physically examined and treated claimant).

supported the ALJ's findings that none of the opinions (including Dr. Kranzler's) were fully persuasive. *Hartranft*, 181 F.3d at 360.

Based on all of the above, the ALJ's treatment of the medical opinion evidence was supported by substantial evidence. Taking the ALJ's decision as a whole, *see Jones*, 364 F.3d at 505 (concluding that an ALJ's opinion should be "read as a whole"), it is clear that he weighed the relevant evidence and ultimately concluded: (1) that the frequency of Plaintiff's migraines had decreased with treatment; and (2) Plaintiff's claims as to the extent her tremors limited her physically were overblown given that she reported Gabapentin helped remediate her symptoms and her ADLs demonstrated as much. (*See* R. 1346-54). Thus, remand is not warranted.

### b.        The RFC Finding and Resulting Hypothetical Question

Plaintiff's contentions regarding the ALJ's RFC determination and resulting hypothetical posed to the VE are both predicated upon her earlier contention that the ALJ "improperly evaluated" the medical evidence in this case. (*See* Pl.'s Br., ECF No. 12, at 24). Because, as explained above, I disagree with this premise, these subsequent contentions also fail.

### c.        Mechanical Application of the Rules

Plaintiff's contention regarding the ALJ's application of Rule 201.12 is also based on a faulty premise, and therefore fails. Plaintiff argues that "[g]iven the highly restrictive limitations assessed by Dr. Carlson, [Plaintiff] should have been found either unable to perform any work or, in the alternative, limited to sedentary exertion." (*Id.* at 29 (alterations added)). Such a finding, according to Plaintiff, would have compelled a finding of disability as of the end of the prescribed period "under a nonmechanical application of the Medical Vocational Guidelines." (*Id.* (alteration added)). However, as discussed above, substantial evidence supported the ALJ's

underlying findings regarding the persuasiveness of Dr. Carlson's opinions, as well as his ultimate RFC determination. *See, supra,* § (V)(B)(2)(i). Therefore, this contention fails as well.

In sum, the ALJ's treatment of the medical evidence was adequate under applicable regulations and substantial evidence supported his RFC finding and subsequent hypothetical question to the VE.

## VI.    CONCLUSION

For the reasons set forth above, I find that the ALJ's findings are supported by substantial evidence. Accordingly, Plaintiff's request for review is **DENIED**. An appropriate Order follows.

BY THE COURT:


   /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge

34